## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROBERT DONOVAN, | : |
| | : |
| Plaintiff, | : Hon. Joseph H. Rodriguez |
| | : |
| v. | : Civil Action No. 1:17-cv-04011 |
| | : |
| A-VALLEY ENGINEERS, | : **OPINION** |
| INC. AND LOTHAR BUDIKE, | : |
| SR., | : |
| | : |
| Defendants. | : |

This case is before the Court on Defendants' Motion for Summary Judgment [Dkt. No. 51]. The Court has considered the parties' written submissions pursuant to Fed. R. Civ. P. 78 (b). For the reasons stated below, the Court will grant Defendants' Motion for Summary Judgment [Dkt. No. 51].

### I.     Background

Defendant, A-Valley Engineers, Inc. ("A-Valley") "is an engineering, inspections and industrial maintenance firm that specializes in real-time, pre-and post-forensic engineering studies and inspection on all marine and landside mechanical, electrical, and nuclear apparatus worldwide." [Dkt. No. 51-2 ("Def. SMF") ¶ 2]. Defendant, Lothar Budike, SR., ("Mr. Budike") is A-valley's President and Chairman. (Id. at ¶ 3). Plaintiff, Robert Donovan ("Plaintiff"), was an employee of A-Valley from 2003/2004 to June 2016. (Id. at ¶ 1).  During the relevant time period, Plaintiff was the Senior Project Manager, making him second in charge of the A-Valley workforce. (Id. at ¶¶ 6,9). In this role, Plaintiff worked mostly out of A-Valley's Camden, New Jersey Office. Plaintiff also spent some of his time working at Philadelphia International Airport, where A-Valley

provides its services. (Id. at ¶ 3). As Senior Product Manager, Plaintiff oversaw day-to-day operations, handled the company billing, assisted in legal matters, made work schedules for employees, ordered supplies and equipment, filled out reports and service tickets, supervised employees, and made recommendations regarding the hiring and firing of individuals. (Pl. Dep. 27:16-31:2). By February 2016, A-Valley was compensating Plaintiff with a set salary of $10,000 per month. (Def. SMF ¶ 5).

In 2016, Plaintiff had surgery stemming from "issues of pain and injury" to his right shoulder. (Pl. Dep. 91:13-93:1). Plaintiff believes his shoulder injury was initially caused by "wear and tear," explaining that the work he was performing likely caused the discomfort. (Pl's Dep. at 137:17-22). Plaintiff advised Mr. Budike of this injury in January 2016, and told him that he "would probably be out of work for three to six months with the physical therapy . . . [Mr. Budike] said, don't worry about it, you can do paperwork for me in the office. . . . And I'll still pay you so you don't have to file a Workman's comp claim." (Pl. Dep. 136:1-137:3). Plaintiff was able to return to work on light duty, undertaking office work. (Id. at 93:2-4). He still collected his full monthly salary. (Id. at 93:5-8). Plaintiff and Mr. Budike did not discuss workers' compensation after this January 2016 conversation. (Def. SMF. ¶ 31). Plaintiff did not file any workers' compensation claim for this injury. [Dkt. No. 55-1, ("Pl. Resp. to SMF"), ¶ 25].

In May 2016, Plaintiff re-injured his shoulder working at the airport. (Def. SMF ¶ 27). At that time, Plaintiff was "more active" engaging in physical labor. Plaintiff was pulling a hose that got caught while pressure washing exhaust fans with "the guys" when he heard a "pop" of his right shoulder. (Pl. Dep. 94-95). Plaintiff was evaluated by his Doctor, who ultimately recommended a second surgery. Plaintiff informed Mr. Budike about the possibility of that second surgery on May 10, 2016. (Id. at ¶ 28). Mr. Budike

suggested that Mr. Donovan consult another doctor for a second opinion. (Id. at ¶ 9). Plaintiff did not file a claim for workers' compensation for this injury until July 2016, after Plaintiff's termination from A-Valley.

On May 25 and May 27, 2016, Mel Hannah, the Vice President and General Manager of MarketPlace PHL, e-mailed Plaintiff to request "all PHL ID Badges" currently in the possession of A-Valley. (Def. SMF ¶ 34). Market Place PHL, the Airport entity that hired A-Valley, made annual requests of Defendant regarding ID Badges. Plaintiff dropped off the information to MarketPlace PHL, but did not speak to Mr. Hannah. (Pl. Resp. to SMF ¶ 35). Mr. Hannah later informed Mr. Budike, via email, that 3 ID badges were missing. [Dkt. No. 51-4, Ex. 7]. Mr. Budike claimed there was an investigation into Plaintiff as a result, but Plaintiff testified that to his knowledge, there was no such investigation. (Pl. Dep. 123:22-124:7). Mr. Budike accused Plaintiff and his colleague, Richard Poore, of "using secret badges to sneak in and out of the airport to plant pods on the roof of the airport." (Pl. Dep. 132:9-24). Plaintiff testified that he only had one badge, and that Mr. Budike had to sign of and approve any new badges. (Id. at 133:4-22). Plaintiff, however, "does not dispute that Mr. Budike sincerely believed that [he] was using duplicate badges to sneak people onto the airport property as part of a criminal conspiracy." (Def. SMF ¶ 39).

In early June 2016, Mr. Budike told Plaintiff his "[company] vans were searched and they're doing an investigation, and he [couldn't] be seen with [Plaintiff] at the airport or anywhere else" (Pl. Dep. 117:1-5), meaning his services were no longer needed (Id. at 117:6-8). At that time, Defendants' effectively terminated his employment. (Id. at 116:22-117:8, 118:1-4). Mr. Budike claims that the reason for Plaintiff's termination was the alleged investigation, and that there was no longer a job for Plaintiff because his

badge was canceled. (Budike Dep. 99:10-19). Plaintiff filed for workers' compensation benefits on July 12, 2016. (Def. SMF ¶ 44). "Mr. Budike first became aware that Mr. Donovan filed for workers' compensation benefits when [Plaintiff]'s attorney contacted Mr. Budike in July of 2016." (Id. at ¶ 46).

Plaintiff filed a Complaint with this Court on June 5, 2017 against A-Valley and Defendant Mr. Budike (collectively "Defendants"). Plaintiff later amended his Complaint on July 5, 2017, alleging violations of the Fair Labor Standards Act ("FLSA") for failure to pay overtime (Count I); and wrongful termination under Pennsylvania law (Count II). [Dkt. No. 4]. Defendants' answered Plaintiff's Amended Complaint and asserted one Counterclaim for Breach of Contract. Defendants' claim that they loaned Plaintiff a total of $14,300 in late 2012 due for repayment at the end of June 2016, which Plaintiff has failed to pay. [Dkt. No. 18, Counterclaim, ¶¶ 1-8]. Plaintiff denies "that A-Valley or Mr. Budike provided Plaintiff a loan. . . . [or] that Plaintiff owes A-Valley or Mr. Budike any money." (Pl. Resp. to SMF ¶ 47). The parties have completed discovery and Defendants have filed the present Motion for Summary Judgment. [Dkt. No. 51]. That motion is fully briefed.

As an initial matter, Plaintiff withdraws his FLSA claim, accepting Defendants' position, that Plaintiff was in fact exempt from overtime under the FLSA as a salaried, Executive Administrative employee. [Dkt. No. 55, p. 3]. Therefore, Count I is dismissed and Defendants' Motion for Summary Judgment as to Plaintiff's FLSA claim will be granted. Accordingly, the Court will address Plaintiff's only remaining claim for wrongful discharge (Count II).

## II.     Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56 (a). Thus, the Court will enter summary judgment in favor of a movant who shows that it is entitled to judgment as a matter of law, and supports the showing that there is no genuine dispute as to any material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56 (c)(1)(A).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party

must identify specific facts and affirmative evidence that contradict those offered by the moving party. Andersen, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)). Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 322. That is, the movant can support the assertion that a fact cannot be genuinely disputed by showing that "an adverse party cannot produce admissible evidence to support the [alleged dispute of] fact." Fed. R. Civ. P. 56(c)(1)(B); accord Fed. R. Civ. P. 56(c)(2).

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Credibility determinations are the province of the factfinder. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

### III.    Analysis

Count II of Plaintiff's Complaint alleges wrongful termination in violation of "the at-will employment doctrine in Pennsylvania and Pennsylvania state law," for terminating Plaintiff after his second injury "in fear of him filing a worker's compensation claim." [Dkt. No. 4, ¶¶ 63-66]. Defendants argue that Plaintiff's claim under Pennsylvania law fails because Plaintiff cannot prove his prima facie case. [Dkt.

No. 51-1, p. 11]. Plaintiff, however, argues that his claim should be evaluated under New Jersey's Workers' Compensation Laws, and that disputes of fact preclude summary judgment. [Dkt. No. 55, p. 3].

Plaintiff testified that he believes he was injured in Pennsylvania while working at the Philadelphia International Airport. He subsequently filed the relevant workers' compensation claim in Pennsylvania, and collected benefits. (Def. SMF ¶ 44). Plaintiff then filed an Amended Complaint with this Court explicitly seeking relief for wrongful termination under Pennsylvania law—the deadline to amend this claim further has long passed. Therefore, the Court will apply Pennsylvania law to Plaintiff's claim for wrongful termination.[1]

"Under Pennsylvania law, an at-will employee may not be discharged in retaliation for filing a workers' compensation claim." Deily v. Waste Mgmt. of Allentown, 55 F. App'x 605, 608 (3d Cir. 2003) (citing Shick v. Shirey, 552 Pa. 590, 604, 716 A.2d 1231, 1238 (1998)). The Pennsylvania Supreme Court has not yet defined the elements of retaliatory discharge based on an employee's workers' compensation claim; however, federal courts have analyzed such claims under Title VII of the Civil Rights act of 1964. Wilson v. Graybar Elec. Co. Inc., No. CV 17-3701, 2019 WL 1229778, at *18 (E.D. Pa. Mar. 15, 2019). Like Title VII retaliation claims, courts have applied the McDonell Douglas burden shifting paradigm to these cases. Id. Accordingly, to preclude summary judgment, Plaintiff has the initial burden of establishing a prima facie case "by showing that '(1) he engaged in protected activity; (2) he suffered an adverse

---

[1] Notably, the analysis of Plaintiff's claim under New Jersey law is analogous to the analysis under Pennsylvania's law, and there, would ultimately lead to the same outcome. See infra note 2.

employment action either after or contemporaneous with the protected activity; and (3) a causal connection exists between his protected activity and the employer's adverse action.'" Id. (quoting Kieffer v. CPR Restoration & Cleaning Serv., LLC, 200 F. Supp. 3d 520 (E.D. Pa. 2016), aff'd sub nom., 733 F. App'x 632 (3d Cir. 2018)). [2]

Here, Defendants' argue that: (1) Plaintiff did not engage in protected activity; and (2) even if Plaintiff did engage in protected activity, he cannot establish any causal connection between his July 2016 workers' compensation claim and his June 2016 termination.

An employee engages in protected activity when he/she files a claim for workers' compensation. See Gonzales v. Purolite Corp., No. CV 17-2983, 2019 WL 4277456, at *8 (E.D. Pa. Sept. 10, 2019). A Plaintiff does not, however, engage in protected activity when such a claim is filed post-termination. See Alderfer v. Nibco Inc., No. CIV. A. 98-6654, 1999 WL 956375, at *6 (E.D. Pa. Oct. 19, 1999) (agreeing that Plaintiff could not recover for retaliatory discharge where Plaintiff admitted that "she did not exercise any of her rights under the Workers' Compensation Act while employed"); see also Larochelle v. Wilmac Corp., 210 F. Supp. 3d 658, 716 (E.D. Pa. 2016), clarified on denial of reconsideration, No. 12-CV-5567, 2016 WL 6135577 (E.D. Pa. Oct. 21, 2016), aff'd, 769 F. App'x 57 (3d Cir. 2019), and aff'd, 769 F. App'x 57 (3d Cir. 2019) (noting that "in Alderfer, even where the work injury was reported to the employer, the court found no protected activity because there was no claim filed prior to

---

[2] Under New Jersey law,"[t]o make a *prima facie* case for a retaliatory discharge the employee must prove: (1) that he made or attempted to make a claim for workers' compensation; and (2) that he was discharged in retaliation for making that claim." Galante v. Sandoz, Inc., 192 N.J. Super. 403, 407, 470 *A.*2d 45 (Law Div. 1983), aff'd, 196 N.J. Super. 568, 483 A.2d 829 (App. Div. 1984). Additionally, "courts look to correlative federal law to supply the relevant standards for evaluating the claim." Morris v. Siemes Components, 928 F. Supp. 486, 493 (D.N.J. 1996).

termination"). In this case, it is undisputed that Plaintiff filed a workers' compensation claim weeks after his termination. Therefore, Plaintiff's claim is not considered protected activity. Notwithstanding, Plaintiff argues that he engaged in protected activity when he reported each of his injuries to Defendants.

Pennsylvania Courts have held that "a plaintiff must (1) report the work-related injury and (2) express the intent to file a workers' compensation claim to the employer in order to trigger the protection of the public policy exception." Runion v. Equip. Transp., LLC, No. 1:15-CV-2159, 2017 WL 3839917, at *4 (M.D. Pa. Sept. 1, 2017) (emphasis added) (citing Smith v. R.R. Donnelley & Sons Co., No. CIV.A. 10-1417, 2011 WL 4346340, at *6 (E.D. Pa. Sept. 16, 2011) ("[F]ederal courts in Pennsylvania have oft predicted that the Pennsylvania Supreme Court, in furthering the public policy underlying the WCA, would extend the protection of the Act to injured employees who have expressed their intent to pursue workers compensation claims.")). It is undisputed that Plaintiff reported both of this work-related injuries to Defendants, therefore, the issue before the Court is whether Plaintiff, at a minimum, expressed his intent to file for workers' compensation to Defendants. Even in a light most favorable to Plaintiff, the facts fail to show that Plaintiff expressed any such intent.

The record before the Court establishes that Plaintiff discussed the topic of workers' compensation with Mr. Budike in January 2016, when he informed Mr. Budike of his first injury that would require surgery. When asked about the details of this conversation, Plaintiff testified:

> I told him the doctor recommended me having surgery and that I would probably be out of work for three to six months with the physical therapy. Depending on how the shoulder healed. So before I could say yes – he said, don't worry about it, you can do paperwork for me in the office. We have a

> lot of work we need to do And I'll still pay you so you don't have to file a Workman's comp claim.

(Pl. Dep. 136:10-137:3). This was Plaintiff's only conversation about workers' compensation, with regard to Plaintiff's injuries. Plaintiff did not have any communications about <u>submitting</u> a workers' compensation claim. (Pl. Dep. 135:2-20). In May, when Plaintiff reported his second shoulder injury, there was no mention of workers' compensation.

 To be sure, Plaintiff testified that he was unaware of "any facts in which [Mr. Budike] knew that [he was] contemplating or going to file a workers' [compensation] claim". (Pl. Dep. 139:22-140:2). Instead, Plaintiff generally argues that "[a]t all times, Defendant was aware that Plaintiff wanted either medical leave or, alternatively, light duty work, and for his job to be protected while he recovered from his work injury;" but provides no support from the record indicting as much. [Dkt. No. 55, p. 5]. Furthermore, "it is not merely the employer's awareness of the work-related injury that evidences the plaintiff engaged in protected activity." <u>Smith</u>, 2011 WL 4346340, at *6. Therefore, Plaintiff cannot show that he engaged in protected activity. <u>See</u> <u>Larochelle v. Wilmac Corp.</u>, 210 F. Supp. 3d 658, 716 (E.D. Pa. 2016) (holding that plaintiff's wrongful discharge claim failed as a matter of law because there was no evidence that defendants were aware of the plaintiff's intent to file a workers' compensation claim, and plaintiff did not file a workers' compensation claim prior to being fired).

 Even assuming, arguendo, that Plaintiff's conduct was sufficient to establish element one of his prima facie case, Plaintiff cannot show a causal connection exists between any possible protected activity and his termination. First, no reasonable jury could find a causal link between Plaintiff's termination and his workers' compensation

claim because his claim was not filed until weeks after Defendants' terminated his employment. See Larochelle, 210 F. Supp. 3d at 716. Second, the record here, is devoid of any evidence that supports Plaintiff's "theory"—that Mr. Budike "was a little nervous" about Plaintiff filing a workers' compensation claim for his second injury and, therefore, terminated him. (See Pl. Dep. 139:1-21).

Plaintiff's argument mainly relies on his own testimony, which provides that Plaintiff thought Mr. Budike was afraid he was going to file a claim for workers' compensation benefits for his second injury because Mr. Budike acted nervously during their January 2016 conversation. (Pl. Dep. 139:1-9). That conversation between Plaintiff and Mr. Budike, however, concerned Plaintiff's first injury, which did not result in any workers' compensation claim. Moreover, the record shows that there were no statements or discussions about a potential workers' compensation claim following Plaintiff's second injury.

Instead, Plaintiff contends that Defendants displayed "lingering antagonism" towards him after reporting his second injury. [Dkt. No. 55, p. 8-9]. Plaintiff provides just one example of alleged antagonism. He testified that while on light duty, "Budike began assigning work directly to Plaintiff's direct reports even though before the May injury, Plaintiff assigned and delegated work." (Id. at p. 8; Pl. Dep. 104:22-105:9). According to Plaintiff, Mr. Budike told him he was doing so because he was "taking care of ["Plaintiff's"] shoulder." (Id. at 104:14-21). This was the only conversation about the subject. (Id. at 105:10-16). Plaintiff makes no other allegations that Defendants' treated Plaintiff differently. Although Plaintiff was terminated about one month after the second injury, "the mere fact that adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link

between the two events." <u>Robinson v. City of Pittsburgh</u>, 120 F.3d 1286, 1302 (3d Cir. 1997), <u>overruled on other grounds by</u>, <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006).

"A plaintiff must produce at least some evidence that connects the dots between [his] [protected activity] and [his] termination, such as adverse personnel action promptly after her workers' compensation claim was made, statements by supervisors referencing her claim, documents from the employer discussing her claim with respect to her termination, etc." <u>Christman v. Cigas Machine Shop, Inc.</u>, 293 F. Supp. 2d 538, 544 (E.D. Pa. 2003) (quoting <u>Landmesser v. United Air Lines, Inc.</u>, 102 F. Supp. 2d 273, 278 (E.D. Pa. 2000)). Here, Plaintiff's own testimony and very limited evidence are insufficient to establish a genuine dispute over whether Defendants' terminated Plaintiff out of fear he would file a claim.[3]

Rather, the undisputed facts establish that the only relevant discussion concerning workers' compensation between Plaintiff and Mr. Budike occurred in January 2016. This conversation dealt with Plaintiff's initial shoulder injury and first surgery. As stated above, Mr. Budike told Plaintiff "don't worry about it, you can do paperwork for me in the office. . . . And I'll still pay you so you don't have to file a Workman's comp[sic] claim." (Pl. Dep. 136:1-137:3). To be sure, Plaintiff did return to light duty work and collected his full monthly salary. (<u>Id.</u> at 93:2-8). This conversation was approximately five (5) months prior to Plaintiff's termination, and six (6) months

---

[3] Notably, "[Plaintiff's] self-serving deposition testimony, when juxtaposed against the rest of the record, is insufficient to meet his burden of "point[ing] to some evidence in the record that creates a genuine issue of material fact." <u>Runion v. Equip. Transp., LLC</u>, No. 1:15-CV-2159, 2017 WL 3839917, at *6 (M.D. Pa. Sept. 1, 2017) (quoting <u>Berckeley Inv. Grp., Ltd. v. Colkitt</u>, 455 F.3d 195, 201 (3d Cir. 2006)).

before Plaintiff filed for workers' compensation benefits. Plaintiff's workers' compensation claim involved his May 2016 injury (in which Plaintiff re-injured his same shoulder). While Mr. Budike was informed of the second injury, no conversation about workers' compensation occurred. (Def. SMF ¶ 28). Thus, outside of Plaintiff's mere speculation, the Court finds no evidence connecting Plaintiff's termination to the idea that Defendants' were concerned about him filing a workers' compensation claim.

    I.    <u>Conclusion</u>

For the forgoing reasons, the Court will grant Defendants' Motion for Summary Judgment [Dkt. No. 51].

An appropriate Order will be entered.

Dated: September 9th, 2020

                                            <u>/s/ Joseph H. Rodriguez</u>

                                              JOSEPH H. RODRIGUEZ, USDJ